UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| KENNETH McDOWELL, | ) | |
|---|---|---|
| Plaintiff, | ) | No. 13 C 3615 |
| | ) | |
| v. | ) | |
| | ) | |
| OFFICER DIAZ, | ) | Hon. Ronald A. Guzmán |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Kenneth McDowell, (hereinafter, "Plaintiff" or "McDowell") has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983. Plaintiff alleges that he was subjected to excessive force when Correctional Officer Diaz placed cuffs on him despite a pre-existing injury to his hand. Diaz moves for summary judgment, arguing that Plaintiff cannot establish that the force was excessive and, in the alternative, that Diaz is entitled to qualified immunity.[1] For the reasons stated below, the motion [65] is granted.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining the existence

---

[1] Plaintiff also named a Paramedic O'Mackey as a defendant in this suit. On initial review pursuant to 28 U.S.C. §1915A, the Court allowed Plaintiff to proceed against O'Mackey on a claim of deliberate indifference to a serious medical condition. However, Plaintiff never served the complaint on O'Mackey, and he has not appeared nor answered. On October 3, 2013, the Court entered an order issuing alias summons in this case and warning Plaintiff that if he failed to submit the proper paperwork to the U.S. Marshal for effectuation of service, the case may be dismissed for want of prosecution. Plaintiff was notified that there was no O'Mackey employed by Cermak Health Services. (Dkt. # 19.) Accordingly, as Plaintiff never pursued his claims against O'Mackey, any claims against him are dismissed pursuant to Fed. R. Civ. P. 4(m) and Fed. R. Civ. P. 41(b).

of a genuine issue of material fact, a court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Weber v. Univs. Research Assocs., Inc.*, 621 F.3d 589, 592 (7th Cir. 2010). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The court does not "judge the credibility of the witnesses, evaluate the weight of the evidence, or determine the truth of the matter. The only question is whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009) (citing *Anderson*, 477 U.S. at 249-50.)

However, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004) (citations omitted). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Egonmwan v. Cook Cnty. Sheriff's Dept.*, 602 F.3d 845, 849 (7th Cir. 2010) (quoting *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640-41 (7th Cir. 2008)).

"[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594-595 (7th Cir. 2007) (quoting *Anderson,* 477 U.S. at 249-50

(internal citations omitted)). The inquiry is essentially "whether the evidence presents a sufficient disagreement to require submission to the jury, or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## **LOCAL RULE 56.1 (N.D. ILL.)**

Diaz filed a statement of uncontested material facts pursuant to Local Rule 56.1. (Dkt. # 66.) Diaz also provided Plaintiff a "Notice to Pro Se Litigant Opposing Motion for Summary Judgment," as required by L.R. 56.2. (Dkt. # 67.) That notice clearly explains the requirements of the Local Rules and warns a plaintiff that a party's failure to controvert the facts as set forth in the moving party's statement results in those facts being deemed admitted. *See, e.g., Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003).

Local Rule 56.1(b) requires a party opposing a motion for summary judgment to file:

> (3) a concise response to the movant's statement that shall contain
>
> (A) a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon, and
>
> (B) a statement, consisting of short numbered paragraphs, of any additional facts that require denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon.

L.R. 56.1(b).

The district court may rigorously enforce compliance with Local Rule 56.1. *See, e.g., Stevo v. Frasor*, 662 F.3d 880, 886-87 (7th Cir. 2011) ("Because of the high volume of summary judgment motions and the benefits of clear presentation of relevant evidence and law, we have repeatedly held that district judges are entitled to insist on strict compliance with local rules

3

designed to promote the clarity of summary judgment filings.") (citing *Ammons v. Aramark Uniform Serv., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004)). *Pro se* plaintiffs are also required to comply with procedural rules. *Cady v. Sheahan*, 467 F.3d 1057, 1061 (7th Cir. 2006).

Diaz initially filed a motion for summary judgment on July 10, 2014. (Dkt. # 54.) In response, Plaintiff raised complaints at that time regarding purported discovery he had not received. The Court denied Diaz's motion for summary judgment without prejudice, pursuant to Fed. R. Civ. P. 56(d), and directed the parties to resolve any discovery disputes before pursuing summary judgment. The parties did so and Diaz filed his renewed motion for summary judgment on September 29, 2014.

In response to Diaz's renewed motion, Plaintiff filed three affidavits, which the Court construed collectively as a motion for extension of time in which to respond to Diaz's motion for summary judgment. (Dkt. ## 70, 71, 73.) The Court granted Plaintiff additional time to respond. Instead of responding as ordered, Plaintiff filed on December 5, 2014 another affidavit discussing discovery issues. The Court set a status hearing for December 19, 2014, at which all discovery issues were resolved. The Court then set a final deadline of January 21, 2015 for Plaintiff to submit his response to the motion for summary judgment.

Again, instead of filing a response on January 12, 2015, Plaintiff filed an affidavit regarding discovery materials. (Dkt. # 78.) Diaz responded, arguing that all medical records and other disputed materials had been delivered to Plaintiff, for the third time, in open court on December 19, 2014. Plaintiff filed no additional documents in response to Diaz's motion for summary judgment. Accordingly, Diaz's statements of uncontested facts are deemed admitted. However, because Plaintiff is proceeding *pro se*, the Court will consider any factual assertions he

4

makes in his affidavits to the extent that he could properly testify about the matters asserted at trial. *See* Fed. R. Evid. 602.

## FACTS

Plaintiff initially entered the Cook County Jail ("Jail") on September 22, 2012 and remained there until May 15, 2013, when he was released on probation. (Def.'s 56.1(a)(3) Stmt., Dkt. # 66, ¶ 1.) Diaz is and was at all times relevant to the complaint employed as a correctional officer at the Jail. (*Id*. ¶ 2.)

On September 17, 2012, prior to his arrest, Plaintiff went to a hospital with an injured right hand and was diagnosed with a possible fracture. (*Id*. ¶ 5.) Plaintiff arrived at the Jail on September 22, 2012 and received a medical evaluation. (*Id*. ¶ 6.) He was diagnosed with a "boxer's fracture," a break of the fifth metacarpal bone, which is located directly below the pinky finger. (*Id*.) Plaintiff was given a splint for his right hand. (*Id*.)

Plaintiff subsequently received medical attention at the Jail for several conditions, including his right hand. (*Id*. ¶ 7.) On October 9, 2012, Plaintiff went to the Cermak Health Services emergency room, complaining of continued pain in his hand. (*Id*.) Upon examination, Cermak personnel observed some deformity and tenderness in his hand, and ordered Plaintiff to continue wearing the splint and Ace bandage. (*Id*.) On October 17, 2012, Plaintiff was sent to an outpatient hand clinic where the fracture to his fifth metacarpal was confirmed. (*Id*.) Plaintiff was given a removable splint and encouraged to attempt an active range of motion with his hand. (*Id*.) On November 2, 2012, Plaintiff was seen by a physician assistant employed by Cermak, who observed that Plaintiff was wearing his splint. (*Id*.) On November 30, 2012, Plaintiff was seen by a Cermak physician assistant, to whom Plaintiff reported intermittent pain with an

5

improving range of motion. (*Id.*) Plaintiff was noted as wearing a splint on that day. (*Id.*)

Division 11 of the Jail is situated across from the main Jail campus, requiring the inmates to be transported through public areas in order to reach Cermak Health Services. (*Id.* ¶ 10.) The inmates must be transported via bus or van to get to locations outside of Division 11. (*Id.*) Inmates to be transported are held in a secured holding area to await transportation. (*Id.*) Several correctional officers supervise the holding area and are responsible for securing and searching the inmates before and after transportation. (*Id.*)

Jail policy requires that every inmate being transported out of a secured holding area be handcuffed. (*Id.* ¶ 12.) All inmates are handcuffed for the safety and security of everyone involved. (*Id.*) Handcuffing ensures, among other things, officer, inmate, and public safety, and overall Jail security, because an unsecured inmate could pose significant security risks to the Jail campus if he were to take control of a Cook County Sheriff's bus. (*Id.*)

Inmates may sometimes have protective bandaging or casts over injured body parts. (*Id.* ¶ 13.) Protective wear requires heightened security considerations because it may provide hiding places for contraband. (*Id.*) The fact that Plaintiff had a splint or bandage on his hand or wrist did not exempt him from the requirement that he be handcuffed during transport. (*Id.*) In situations where regular handcuffs would be too tight around a splint or bandage, Diaz uses leg shackles in order to provide a more comfortable fit and he assumes any splint or bandage would protect the injured area from pain or discomfort related to handcuffing. (*Id.*) The only instance in which an inmate will not be handcuffed is when the inmate has an active prescription from a doctor requiring that he not be handcuffed. (*Id.* ¶ 14.) Such a prescription means that a doctor has ordered that the detainee not be handcuffed because of a sufficiently serious medical

condition. (*Id*.) Plaintiff did not have a "no cuff" prescription at the time of the incident at issue. (*Id*. ¶ 15.)

On the morning of December 8, 2012, an unnamed correctional officer took Plaintiff to a holding area, where he waited with other inmates to be transported to the Cermak Medical Services facility. (*Id*. ¶ 9.) On that day, Diaz was assigned to be a transportation officer, which required him to drive the van between Division 11 and the various buildings where inmates needed to go that day. (*Id*. ¶ 11.) Diaz assisted in preparing the inmates for transport. (*Id*. ¶¶ 11, 18.)

Diaz first attempted to put a pair of regular cuffs on Plaintiff, but they would not fit around his splint. (*Id*. ¶ 18.) Diaz then cuffed Plaintiff's wrists with a pair of leg shackles that were large enough to fit over the splint and lock while still providing enough room for the splint to move. (*Id*.) Diaz cuffed Plaintiff with his hands in front of him at the wrist. (*Id*. ¶ 19.) Plaintiff felt the shackles applying pressure to the splint and testified in his deposition that he so complained to Diaz. (*Id*.; Def's Ex. A, Pl.'s Dep. at 83:10-22.) After Diaz cuffed Plaintiff, Plaintiff was moved to the van and had no further interactions with Diaz. (Def.'s 56.1(a)(3) Stmt., Dkt. # 66, ¶ 20.)

As Plaintiff was trying to get into the van, he slipped. (*Id*. ¶ 21.) Plaintiff braced his fall with both hands when he fell forward. (*Id*.) Within a day following the incident, Plaintiff submitted a Health Service Request Form in which he stated, "While being transported to Cermak, I was cuffed in front by an officer on my cast and slipped while entering the van. My right hand is swollen and feels sharp pain when I try to move my fingers." (*Id*.)

On December 10, 2012, Plaintiff saw a nurse who did not note any swelling, and an

7

emergency room doctor. (*Id.* ¶ 22.) Plaintiff told the doctor he felt the cuffs were placed too tightly on his wrist, which caused some numbness at the base of his thumb. (*Id.*) The doctor reported removing Plaintiff's splint and testing his range of motion. (*Id.*) Plaintiff had full range of motion in his thumb, digits, and wrist. (*Id.*) The doctor also noted there was no swelling or bruising on Plaintiff's wrist where the cuffs would have been applied. (*Id.*) Finally, the doctor noted that the numbness Plaintiff was feeling could have been due to a compressed nerve that would likely resolve without treatment. (*Id.*)

On December 19, 2012, Plaintiff returned to the outpatient hand clinic where he reported that he was experiencing persistent pain and had been taking off his splint to work on his range of motion. (*Id.* ¶ 23.) Plaintiff made no complaints related to his thumb or wrist. (*Id.*) On January 11, 2013, Plaintiff saw a physician assistant at Cermak Health Services for a checkup. According to x-rays, Plaintiff's fracture was healing. (*Id.* ¶ 24.)

On March 22, 2013, Plaintiff had a checkup in the Cermak Health Services clinic. (*Id.* ¶ 25.) The doctor ordered a follow-up x-ray to check on Plaintiff's progress. (*Id.*) Plaintiff was still wearing a bandage and complained of some pain at the time. (*Id.*) Following the x-ray, Plaintiff was referred back to the Stroger Hospital orthopedic clinic for follow up, and was taken for that appointment on April 8, 2013. (*Id.*) The doctor at Stroger noted a malunion of the bones in his hand. (*Id.*) Plaintiff informed the doctor that his hand had been reinjured two weeks prior. (*Id.*) Plaintiff was given another splint for his hand and naproxen for pain relief. (*Id.*) On April 19, 2013, Plaintiff reported that the pain in his hand was under control because of the prescribed pain medication. (*Id.*)

Plaintiff filed suit on May 15, 2013, alleging that on December 8, 2012, Diaz handcuffed

Plaintiff's previously-injured hand to prepare him to be transported to Cermak Health Services, which exacerbated his preexisting hand injury and led to permanent damage. (*Id.* ¶ 4.)

## ANALYSIS

In order to establish excessive force, a pretrial detainee must show that the force purposely or knowingly used against him was objectively unreasonable. *Kingsley v. Hendrickson*, — S. Ct. —, No. 14-6368, 2015 WL 2473447, at *6 (June 22, 2015). A court cannot apply this standard mechanically. *Id.* at *5. "Rather, objective reasonableness turns on the facts and circumstances of each particular case." *Id.* (citation and internal quotation marks omitted). "A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* "A court must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)).

"Considerations bearing on the reasonableness or unreasonableness of the force used include: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley,* 2015 WL 2473447, at *6. The Supreme Court held that this list is not meant to be exhaustive and is merely illustrative of the types of objective circumstances potentially relevant to a determination of excessive force. *Id.*

With respect to claims that handcuffs were applied too tightly, courts have found no viable constitutional claim where the plaintiff complained to the officers only a few times and the evidence could not establish that officers were aware that the cuffs were causing serious pain or injury. *See Sow v. Fortville Police Dep't*, 636 F.3d 293, 304 (7th Cir. 2011); *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009); *Tibbs v. City of Chi.*, 469 F.3d 661, 663 (7th Cir. 2006). In *Sow*, the Seventh Circuit affirmed summary judgment where the plaintiff complained only once about his cuffs being too tight, but never elaborated on his complaint. *Sow*, 636 F.3d at 304. In *Stainback*, the Seventh Circuit found that the arresting officers did not use excessive force, but explained, "[h]ad the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback." *Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013) (citing *Stainback*, 569 F.3d at 773).

The record indicates that Plaintiff had a splint on his hand/wrist and that he complained to Diaz that the shackles used to restrain him were too tight. (Def's Mot. Summ. J., Ex. A, Pl.'s Dep. at 83:10-22.) Specifically, when asked what happened with respect to the incident at issue, Plaintiff testified as follows:

> A. Okay. That particular day, I don't remember who else got cuffed. All I know is they ran out of cuffs and other officers told Officer Diaz not to cuff me. I think I was around maybe the last one, and they ran out of cuffs. So Officer Diaz asked them to give him [leg] shackles because they would try to keep up with their own personal set of cuffs. So when he ran out of regular handcuffs, the cuffs that he was trying to put on me wouldn't fit. And then he was still holding this hand with the brace on,

and it was pushed in this way (gesturing) and whatever – you will see it on the video. A guy – Someone handed him cuffs, and they were much bigger. And that's what he put on me. He put the shackle on my . . . .

Q. Okay. And the shackle was big enough to go around your cast?

A. Yes. And then he – While he was holding [t]his hand, I heard something snap. He came over with – he put the – placed the cuffs on and then he squozed (phonetic) it as hard as it could go. And I was on – I was in pain like – it was four hours straight. But he – I'm just telling you, that's how determined he was to cuff me. He didn't have – The shackles are for your ankles. He didn't have to use anything, let alone he wasn't supposed to. But that's how determined he was.

In response to additional questioning, Plaintiff further testified as follows:

Q. I'm asking, where did he cuff you?

A. Somewhere in between the hand and the wrist (indicating).

Q. Okay. Where did he cuff you?

A. Well, you got the (indicating) –

Q. Now you're pointing to the wrist area. Okay.

A. In – like in here (indicating).

Q. Okay. Right at the base of your hand at the wrist?

A. Right. Right in that area.

Q. Okay. So after that – When he did that, you complained about it?

A. I complained to him before he did it; but when he – after he did it, I complained even more.

Q. What did you say?

A. He –

Q. What did you say?

11

> A. Oh, what did I say?
>
> Q. Yeah.
>
> A. I asked him why he was doing it. I was telling him, "Hey, these cuffs are too tight." I said, "Why are you cuffing me anyway? I'm not supposed to be cuffed." I said, "All the other officers know that."
>
> Q. Was everyone else in the area cuffed?
>
> A. That I remember – If I could remember correctly – From what I saw, yeah, every – if you were going to be moved, you got cuffed unless you were injured. I wasn't supposed to have been cuffed, but I got cuffed.

(*Id*. at 82:24-84:4.)

Finally, as the following testimony indicates, Plaintiff believed that Diaz had made the condition of his hand worse.

> A. I felt that – I think he made it – Whatever the injury already was, he made it worse. . . . But I know he made it worse because my hand wasn't like this, the way it looks now. It's pushed in now and the webbing is higher. It's deformed now.
>
> Q. Okay.
>
> A. I believe if he had not done that – And it was so tight and I heard it crack. He made – When he put the cuff on, he pushed the splint into my hand, pushing it like this (gesturing). My hand was like under – this came under. So basically he crushed it, and – by leaving it on for three or four hours.

(*Id*. at 110:11-111:1.)

As the *Stainback* court recommended, Diaz took Plaintiff's injury into consideration by using leg shackles instead of handcuffs because they are larger and provide both security and a more comfortable fit around the injury. The record also indicates that Plaintiff complained only once, perhaps twice, while being cuffed and then had no further contact with Diaz. "Handcuffs,

12

by their very nature, are restrictive, uncomfortable, and unfamiliar to most individuals." *Kopec v. Tate*, 361 F.3d 772, 782 (3rd Cir. 2004); *see also LaLonde v. Cnty. of Riverside*, 204 F.3d 947, 964 (9th Cir. 2000) ("Handcuffs are uncomfortable and unpleasant"). An inmate who makes only a few general complaints about his handcuffs hurting cannot establish that officers acted with the requisite state of mind to support a constitutional violation. *Ortiz v. City of Chi.*, No. 09 C 2636, 2010 WL 3833962, at *11 (N.D. Ill. Sep. 22, 2010) (generalized complaints, without more, were insufficient to maintain a constitutional claim based on overly tight handcuffs) (*citing Stainback*, 569 F.3d at 773).

Considering the relevant factors established in *Kingsley*, the record establishes that Diaz did not subject Plaintiff to excessive force. The evidence shows that there was a need for the cuffs based on safety and security considerations because Plaintiff was being transported through public areas to Cermak Medical Services. Additionally, when an inmate has a protective covering over an injury there is a possibility that the covering can be used to hide contraband, which, while in transport, can create a dangerous situation. Further, Diaz attempted to avoid any further injury to Plaintiff's hand by using shackles instead of cuffs which, while securing Plaintiff, also allowed for some range of motion. Moreover, an inmate can be transported without handcuffs only if he has a prescription from a doctor requiring it. It is undisputed that Plaintiff had no such prescription.

Cases where the use of handcuffs arguably amounted to a constitutional violation have included additional acts by officers demonstrating a wanton infliction of pain. In *Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003), summary judgment was inappropriate for an officer who allegedly "grabbed [a suspect's] left arm, jerked it into handcuffing position, forced her arm

13

behind her back, slammed the handcuff down on her wrist, jerked her wrist, and tightened the handcuffs until [she] could not feel her hands, . . . [and refused to] loosen the handcuffs or remove them until she arrived at the police station" even though the suspect "protested that the handcuffs were too tight, that she could not feel her hands, and that she was in pain," *Id*. at 774-75. There is no evidence in the record that Diaz had any other contact with or used any additional force against Plaintiff.

Finally, although there is evidence in the record that several months later, in April of 2013, Plaintiff was told his bone had healed improperly, Plaintiff points to no record evidence demonstrating that malunion of the bone can be attributed to Diaz's cuffing. There were intervening events between Diaz restraining Plaintiff's wrists on December 8, 2012, and the diagnosis of misaligned healing in April of 2013. First, Plaintiff admitted that after Diaz applied the shackles to his wrists, he slipped and fell, bracing himself on his wrists, when he was entering the transport van. Two days later, on December 10, 2012, Plaintiff was examined by doctors who found no swelling or bruising, and noted that Plaintiff had full range of motion in his thumb fingers and wrist. Plaintiff complained of numbness but was told that it could be due to a compressed nerve and that it would likely resolve without treatment. Plaintiff had x-rays on January 11, 2013, which indicated that the bone was healing normally. According to medical records, when Plaintiff was diagnosed with the "malunion" of his previously injured finger on April 8, 2013, he notified the doctor that he had reinjured his finger two weeks earlier.

The extent of injury is one of the factors to be considered in determining whether the force used was excessive. *See Kingsley*, 2015 WL 2473447, at \*13. In this case, Plaintiff had multiple instances of treatment for his hand after December 8, 2012, including a December 10,

2012 doctor visit in which the doctor found no swelling or bruising and increased range of motion, and x-rays on January 11, 2013, which indicated that the bone was healing properly. The Court finds that no reasonable jury could conclude that Plaintiff's alleged long-term hand injury was due to Diaz having shackled Plaintiff given Plaintiff's self-reported fall while getting on the transport van, the December 10, 2012 doctor visit and January 2013 x-rays, which indicated that Plaintiff's hand was healing, and the fact that Plaintiff reported re-injuring himself in April of 2013.

In short, weighing all of the required factors under controlling case law, Plaintiff has failed to establish that Diaz subjected him to excessive force, and Diaz is therefore entitled to judgment as a matter of law. Because Defendant Diaz has prevailed on his argument that he did not subject Plaintiff to excessive force, the Court need not address the issue of qualified immunity.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment [#65] is granted. The Clerk is directed to enter judgment in favor of Diaz pursuant to Fed. R. Civ. P. 56. Civil case terminated.

Dated: August 19, 2015

_____
Ronald A. Guzmán
United States District Judge